[Cite as *In re A.B.*, 2022-Ohio-4234.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY

IN RE:

A.B.

CASE NO. 9-22-12

ADJUDGED DEPENDENT CHILD.

O P I N I O N

[TERRY B. - APPELLANT]

Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2019 AB 0234

Judgment Affirmed

Date of Decision: November 28, 2022

APPEARANCES:

*Edwin M. Bibler* for Appellant

*Jocelyn Stefancin* for Appellee

**MILLER, J.**

{¶1} Father-appellant, Terry B., appeals the March 16, 2022 judgment of the Marion County Court of Common Pleas, Family Division, granting permanent custody of his son, A.B., to appellee, Marion County Children Services (the "Agency"). For the reasons that follow, we affirm.

## I. Facts & Procedural History

{¶2} A.B. is the biological son of Terry B. and Courtney C. A.B. has cerebral palsy, is reliant on a wheelchair, and requires extensive, constant care. The Agency grew concerned that A.B.'s needs were not being met by Terry, with whom A.B. was residing, and that the conditions of Terry's home were unsuitable for A.B.

{¶3} On November 8, 2019, the Agency filed a complaint in the trial court alleging that A.B. was a dependent child. (Doc. No. 1). The Agency requested that A.B. be placed under its protective supervision. A case plan for Terry was adopted by the trial court on January 16, 2020.

{¶4} On December 30, 2019, the trial court appointed a guardian ad litem ("GAL") for A.B. (Doc. No. 9). On January 21, 2020, the GAL filed a motion for an emergency hearing, which she requested after a concerning home visit with A.B. and Terry. (Doc. No. 13). An emergency hearing was held on January 24, 2020. (Doc. No. 15). At the conclusion of the hearing, A.B. was committed to the temporary emergency custody of the Agency. (Doc. No. 15).

{¶5} On numerous occasions during the pendency of the case, the Agency dismissed and refiled its complaint. On each occasion, the trial court's previous orders continued in effect and A.B. remained in the temporary custody of the Agency. The Agency refiled its complaint for the final time on November 5, 2020. (Doc. Nos. 50, 51).

{¶6} On November 30, 2020, A.B. was adjudicated dependent with respect to Terry. (Doc. No. 74). On December 17, 2020, A.B. was adjudicated dependent with respect to Courtney. (Doc. No. 58). Following the adjudications, A.B. was continued in the temporary custody of the Agency.

{¶7} On September 3, 2021, the Agency filed a motion requesting permanent custody of A.B. (Doc. No. 77). On November 16, 2021, the GAL filed her report recommending that the Agency be granted permanent custody of A.B. (Doc. No. 87).

{¶8} A permanent-custody hearing was held on November 22, 2021. On March 16, 2022, the trial court granted the Agency's motion and awarded permanent custody of A.B. to the Agency.

## II. Assignment of Error

{¶9} On March 22, 2022, Terry filed a notice of appeal.[1] He raises the following assignment of error for our review:

---

[1] Courtney is not a party to this appeal.

**The trial court's judgment in granting permanent custody was against the manifest weight of the evidence and contrary to law, and amounted to an abuse of discretion, as granting Marion County Children's Services motion for permanent custody was not in the best interest of A.B.**

### III. Discussion

{¶10} In his assignment of error, Terry argues that the trial court's decision awarding the Agency permanent custody of A.B. is against the manifest weight of the evidence.

**A. Manifest-Weight Review of Permanent-Custody Decisions**

{¶11} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.""" *In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶12} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43.

"Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶13} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. Stark No. 2016 CA 00124, 2016-Ohio-7057, ¶ 20. "A reviewing court should find a trial court's permanent custody decision against the

manifest weight of the evidence only in the "'"exceptional case in which the evidence weighs heavily against the [decision]."'" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

**B. Standards & Procedures for the Termination of Parental Rights**

**{¶14}** The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 6.

**{¶15}** "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory

requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶16} As relevant to this case, R.C. 2151.414(B)(1) provides:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

R.C. 2151.414(B)(1)(d).

{¶17} "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38 and 9-15-39, 2017-Ohio-142,

¶ 23, quoting *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55 and

citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis

of R.C. 2151.414(D)." *Id.*

**{¶18}** "Under R.C. 2151.414(D)(1), the trial court is required to consider all

relevant factors listed in that subdivision, as well as any other relevant factors." *Id.*

at ¶ 24, citing *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12 and 8-13-13, 2014-

Ohio-755, ¶ 27. The factors specifically listed in R.C. 2151.414(D)(1) are:

> (a)    The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b)    The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c)    The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d)    The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e)    Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "Under this test, the trial court considers the totality of the

circumstances when making its best interest determinations. No single factor is

given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16.

**C. The trial court's decision granting permanent custody of A.B. to the Agency is not against the manifest weight of the evidence.**

{¶19} Terry does not dispute that A.B. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody on September 3, 2021. Therefore, Terry does not challenge the trial court's determination that R.C. 2151.414(B)(1)(d) applies to A.B. Instead, in his assignment of error, Terry argues the trial court erred by determining that permanent custody is in A.B.'s best interest. Thus, the sole issue in this case is whether clear and convincing evidence supports the trial court's finding that permanent custody is in A.B.'s best interest.

{¶20} At the permanent-custody hearing, Makenzie McGill, an ongoing caseworker with the Agency, testified about A.B., his needs, and the events that precipitated his removal from Terry's home. McGill testified that A.B. has cerebral palsy and a history of significant seizures. (Nov. 22, 2021 Tr. at 9). She stated that A.B. underwent surgery when he was two years old to address the seizures and that he experiences fewer seizures at present, though he is still taking some medication to ameliorate them. (Nov. 22, 2021 Tr. at 10). McGill further testified that the right side of A.B.'s body is mostly paralyzed, that he relies principally on a wheelchair to move about, and that he is blind in one eye and partially deaf. (Nov. 22, 2021 Tr. at 10). According to McGill, A.B. is nonverbal. (Nov. 22, 2021 Tr. at 11).

{¶21} At the time of A.B.'s removal, A.B. was living with Terry. According to McGill, Courtney has little to no involvement with A.B. McGill testified that, during the pendency of the case, Courtney expressed that she is not able to care for A.B. (Nov. 22, 2021 Tr. at 14). McGill said that Courtney had no visitation with A.B. (Nov. 22, 2021 Tr. at 15).

{¶22} McGill testified that A.B. was initially removed from Terry's care due to concerns about the safety and cleanliness of Terry's home, as well as A.B. being underweight, issues relating to A.B.'s medical care, and his lack of attendance at school. McGill stated that Terry's home was extremely dirty, with cat litter and feces on the floor, among other things. According to McGill, A.B. had been sent to school with cockroaches on him, and on occasions, school personnel would have to bathe A.B. because he would be covered in his own feces. (Nov. 22, 2021 Tr. at 41). McGill testified that, at the time, A.B. needed hip surgery but doctors would not operate because they were concerned that the conditions of Terry's home would expose A.B. to an intolerable risk of infection. (Nov. 22, 2021 Tr. at 41). McGill also testified that Terry's home was extremely cluttered, which was a concern because the clutter made it difficult to move A.B. throughout the home in his wheelchair. (*See* Nov. 22, 2021 Tr. at 17-18).

{¶23} Consequently, obtaining and maintaining safe, clean, and stable housing was a key objective of Terry's case plan. McGill testified that Terry was

provided with storage bins and a dumpster to try to address the clutter in his home. (Nov. 22, 2021 Tr. at 17-18). However, Terry did not remain in his home in Marion. McGill stated that approximately one year before the permanent-custody hearing, Terry was homeless for a period of time before he and his wife settled in a house in Bellefontaine. (Nov. 22, 2021 Tr. at 11, 19). McGill testified that Terry's new house is less cluttered than his Marion house, but that cleanliness issues persist. (Nov. 22, 2021 Tr. at 18). Specifically, Terry still struggles to keep up on dishes and trash that could attract bugs and the house still smells like animal feces and urine. (Nov. 22, 2021 Tr. at 18, 44).

{¶24} But in McGill's view, the problems with Terry's Bellefontaine home go well beyond cleanliness. According to McGill, Terry's Bellefontaine home is in a general state of disrepair. McGill testified that the roof leaks and that the flooring is incomplete or loose in places. (Nov. 22, 2021 Tr. at 12, 21). McGill stated that the unfinished flooring was especially problematic because it would require Terry to carry A.B. in and out of the home. (Nov. 22, 2021 Tr. at 43). In addition, the upstairs level of the home is unfinished and unfurnished, the foundation is sinking, and there is mold and rot. (Nov. 22, 2021 Tr. at 21).

{¶25} McGill also testified that Terry has difficulty maintaining utilities at the Bellefontaine home. (Nov. 22, 2021 Tr. at 17). Electricity is supplied to the home, but Terry often uses a space heater and, on occasion, the stove to heat the

home. (Nov. 22, 2021 Tr. at 58-59). Furthermore, the home was sometimes without running water, which resulted in the toilet and bathtub becoming very dirty. (Nov. 22, 2021 Tr. at 44).

{¶26} Moreover, McGill testified that Terry's Bellefontaine home is not "wheelchair friendly" and that it is very cramped. McGill stated that even if Terry could establish a bedroom for A.B. upstairs, Terry could not consistently get A.B. up and down the stairs because the stairs cannot accommodate A.B.'s wheelchair. (Nov. 22, 2021 Tr. at 42). McGill also testified that the bathroom is not handicap accessible. (Nov. 22, 2021 Tr. at 43). In summarizing her issues with Terry's Bellefontaine home, McGill noted that when A.B. is not in his wheelchair, he "scoots" around on the floor. (Nov. 22, 2021 Tr. at 11-12). In McGill's opinion, the Bellefontaine home is not suitable because A.B. could not safely "scoot" and because his wheelchair could realistically navigate only the first level of the home. (Nov. 22, 2021 Tr. at 11-12, 70).

{¶27} McGill testified about other things standing in the way of A.B. returning to Terry's care. McGill stated that, as part of his case plan, Terry was required to attend A.B.'s medical appointments. McGill testified that while Terry does have a vehicle, he has legal impediments with his driver's license due to outstanding fees. (Nov. 22, 2021 Tr. at 12, 34). As a consequence, Terry could not drive to A.B.'s medical appointments and was absent for the majority of them. (*See*

Nov. 22, 2021 Tr. at 13, 46). Furthermore, due to his vehicle situation, Terry was unable to attend many in-person visits with A.B. (Nov. 22, 2021 Tr. at 16). McGill testified that it had been at least one year since Terry visited in-person with A.B., but that Terry did visit with A.B. over Zoom. (Nov. 22, 2021 Tr. at 16, 22-23). According to McGill, Terry attended most of his scheduled Zoom visits with A.B, and during these visits, A.B. laughed and got along well with Terry. (Nov. 22, 2021 Tr. at 22-23, 36).

{¶28} McGill also testified about Terry's employment history and financial situation. McGill stated that Terry had been able to maintain employment throughout the pendency of the case, though he had recently lost his job. (Nov. 22, 2021 Tr. at 51). McGill testified that Terry receives money from social security and that his wife is also employed. (Nov. 22, 2021 Tr. at 51). In McGill's opinion, given Terry's income, Terry ought to have been able to pay the fines and fees that limited his ability to drive his vehicle. (Nov. 22, 2021 Tr. at 52). According to McGill, Terry instead acquired more pets and paid for their needs while some of his or his wife's own basic needs went unmet. (Nov. 22, 2021 Tr. at 52). McGill stated that Terry had a hard time budgeting and that he was not proficient at financial management or prioritization. (Nov. 22, 2021 Tr. at 52).

{¶29} In addition, McGill stated that Terry had a hard time prioritizing or realizing which of A.B.'s needs were most important or most in need of attention.

(Nov. 22, 2021 Tr. at 17). McGill suggested that Terry had not made much progress on these issues during the pendency of the case and that she doubted he could sufficiently plan for A.B.'s hygienic requirements, his medical appointments, or the rest of his special needs. (Nov. 22, 2021 Tr. at 17, 25). McGill testified that Terry would be capable of meeting A.B.'s emotional needs and that he could care for A.B. on a short-term basis. (Nov. 22, 2021 Tr. at 16). However, she doubted that Terry could consistently care for A.B. for a long period of time. (Nov. 22, 2021 Tr. at 16, 47). McGill testified that "[a] lot of the concern with parenting ability comes from cognitive concerns" about Terry and that parenting classes might help Terry "but not to the standard needed for [A.B.'s] care." (Nov. 22, 2021 Tr. at 55). McGill stated that she was concerned that if A.B. was returned to Terry and if the Agency's involvement ended, then Terry would have to find services and advocate for A.B., which Terry had had a difficult time doing for himself. (Nov. 22, 2021 Tr. at 56).

{¶30} A.B.'s current foster parents, Kenneth and Mary Elizabeth Holycross, also testified at the permanent-custody hearing. The Holycrosses testified that they are specially certified to foster special-needs children like A.B. and that they foster two other special-needs children in addition to A.B. (Nov. 22, 2021 Tr. at 76, 98). They testified that A.B. needs intensive, constant, and around-the-clock care. (Nov. 22, 2021 Tr. at 77, 85, 100-102, 107-109). They stated that, among other things, they must change A.B.'s diaper four to six times per day, maintain his equipment,

feed him a special diet, administer his medications, help him perform certain stretching exercises, and, on occasion, bathe him multiple times per day. (Nov. 22, 2021 Tr. at 77, 86-92, 107). Many of these tasks are physically demanding. (Nov. 22, 2021 Tr. at 86-92, 107-108). In addition, A.B. must see specialists in Columbus one to two times every three months, and he attends speech, occupational, and physical therapy sessions three times every week. (Nov. 22, 2021 Tr. at 79, 109).

{¶31} The Holycrosses testified that A.B. has thrived in their care. They stated that they recently acquired a tablet for A.B., which A.B. can use for rudimentary communication. (Nov. 22, 2021 Tr. at 78). Kenneth testified that the family home is handicap accessible and that A.B. does not spend much of his time at home in his wheelchair. (Nov. 22, 2021 Tr. at 81, 94). Instead, A.B. "scoots" around to various parts of the house, which A.B. can navigate with relative ease. (Nov. 22, 2021 Tr. at 81, 94-95). Mary Elizabeth testified that A.B. prefers to be out of his wheelchair. (Nov. 22, 2021 Tr. at 103). Kenneth testified that A.B. will need a clean home that is handicap accessible and that his caretaker must be able to recognize and attend to A.B.'s needs, understand the recommendations of A.B.'s doctors, and have appropriate transportation for A.B. (Nov. 22, 2021 Tr. at 96). Mary Elizabeth stated that lack of utilities, including running water, unsuitable transportation, and inadequate financial resources would be obstacles to caring for A.B. (Nov. 22, 2021 Tr. at 108-109).

**{¶32}** In addition, the Holycrosses testified that A.B. has integrated well into their family and that he is beloved by his foster siblings. (Nov. 22, 2021 Tr. at 81, 101). Kenneth referred to A.B. as a "pure joy." (Nov. 22, 2021 Tr. at 80). For her part, McGill testified that she observed A.B. interact with his foster parents on numerous occasions and that, based on her observations, A.B. gets along well with his foster parents, who are attentive to his needs and do a good job comforting him when he is upset. (Nov. 22, 2021 Tr. at 26-27). McGill stated that A.B. is bonded with his foster family. (Nov. 22, 2021 Tr. at 26-27). The Holycrosses testified that they are considering adopting A.B. but have not reached a decision yet. (Nov. 22, 2021 Tr. at 83, 103).

**{¶33}** Furthermore, the Holycrosses testified that they try to make sure that A.B. visits with Terry weekly on Zoom. (Nov. 22, 2021 Tr. at 82, 102-103). They stated that the visits go well. (Nov. 22, 2021 Tr. at 82, 102-103). Kenneth testified that A.B. had missed a few Zoom visits with Terry, but that Terry was not at fault for most of the missed visits and that they tried to make up the appointments whenever possible. (Nov. 22, 2021 Tr. at 82).

**{¶34}** Finally, in her report recommending that the Agency be granted permanent custody of A.B., the GAL touched on many of the matters raised in McGill's and the Holycrosses' testimonies. The GAL, pointing to the same cleanliness, habitability, and accessibility issues raised in McGill's testimony,

-16-

opined that Terry's Bellefontaine house was not appropriate for A.B. The GAL also documented the dearth of in-person visits with A.B., and she indicated that she had witnessed several Zoom visits where Terry was "more interested in speaking with the foster parents than in engaging with [A.B.]." (Doc. No. 87). She also noted that A.B.'s placement with the Holycrosses was a "good fit" and that his needs were being met. On cross-examination, the GAL confirmed many of the observations contained in her written report. She testified that while A.B. and Terry have an appropriate relationship, Terry's Bellefontaine home is simply incompatible with A.B.'s needs and, to her knowledge, Terry has not taken any steps to address the issues. (Dec. 6, 2021 Tr. at 16-27). She also testified regarding the issues with Terry's transportation. Specifically, she stated that while Terry has a van that could "technically" accommodate A.B. and his wheelchair, she was not sure whether the van was equipped to securely carry the wheelchair. (Dec. 6, 2021 Tr. at 29).

{¶35} Having reviewed the record, we conclude that clear and convincing evidence supports the trial court's finding that permanent custody is in A.B.'s best interest. Terry clearly loves A.B. and interacts appropriately with him. *See* R.C. 2151.414(D)(1)(a). Moreover, Terry has made some progress in addressing the issues that led to A.B.'s removal from his custody. However, A.B. had been out of Terry's custody for over two years by the time of the trial court's ruling on the Agency's motion for permanent custody. *See* R.C. 2151.414(D)(1)(c). In that time,

Terry failed repeatedly to obtain safe, clean, and accessible housing for A.B., which was perhaps the chief objective of Terry's case plan. *See* R.C. 2151.414(E)(1) and (4); *In re R.P.*, 2d Dist. Montgomery Nos. 27746 and 27747, 2018-Ohio-517, ¶ 58, fn. 3 (indicating that R.C. 2151.414(E)(1) and (4) can be used in the best-interest determination because "R.C. 2151.414(D)(1) does not limit the factors that can be considered"). Furthermore, Terry failed to resolve the issues with his vehicle that would have potentially allowed him to visit with A.B. in person and attend A.B.'s medical appointments, even though it appears Terry had sufficient financial resources to do so. *See* R.C. 2151.414(E)(4). Meanwhile, A.B. was placed with a foster family who attends to all A.B.'s needs and provides A.B. with an accessible living space. A.B. is strongly bonded to his foster family and relates well to his foster parents and foster siblings. *See* R.C. 2151.414(D)(1)(a).

{¶36} Furthermore, there is no reasonable expectation that Terry will be able in the foreseeable future to provide A.B. with the supportive environment he needs to thrive. As indicated by McGill's testimony, there is substantial concern that Terry lacks the skills necessary to consistently recognize, prioritize, and address A.B.'s tremendous needs. These shortcomings were attributed to Terry's "cognitive concerns." "When determining the best interest of a child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base its decision solely on the limited cognitive abilities of the parents." *In re D.A.*, 113 Ohio St.3d 88, 2007-

Ohio-1105, syllabus. However, a parent's cognitive abilities may be relevant to determining the child's best interests where there is "objective evidence" presented showing that the parent's "cognitive status impeded [their] ability to care for [their] children in that [they were] unable to recognize or protect [the] children from harm." *In re M.N.*, 4th Dist. Athens No. 08CA9, 2008-Ohio-4821, ¶ 23. Here, Terry's cognitive issues contributed to A.B.'s removal insofar as they limited Terry's ability to recognize A.B.'s needs, provide a safe and clean environment for A.B., and ensure that A.B. went to school regularly and attended medical appointments. Given Terry's lack of significant progress in this case, it is doubtful that Terry's cognitive issues would not still impede his ability to care for A.B. by rendering Terry unable to fully recognize A.B.'s needs and protect him. Ultimately, A.B. is in need of a legally secure permanent placement, and there is no indication that Terry or anyone within his familial or social circle will be able to provide that. *See* R.C. 2151.414(D)(1)(d).

{¶37} In sum, clear and convincing evidence supports the trial court's determination that permanent custody is in A.B.'s best interest. Therefore, we conclude the trial court's decision awarding permanent custody of A.B. to the Agency is not against the manifest weight of the evidence.

{¶38} Terry's assignment of error is overruled.

## IV. Conclusion

{¶39} For the foregoing reasons, Terry's assignment of error is overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas, Family Division.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**