**[Cite as *In re I.G.*, 2023-Ohio-1529.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:

    I.G.,

ADJUDGED DEPENDENT CHILD.

[ANGELA G. - APPELLANT]

CASE NO.  5-22-36

**O P I N I O N**

**Appeal from Hancock County Common Pleas Court**
**Juvenile Division**
**Trial Court No.  20213017**

**Judgment Affirmed**

**Date of Decision:   May 8, 2023**

APPEARANCES:

    *Linda Gabriele* **for Appellant**

    *Emil G. Gravelle, III*  **for Appellee**

**WALDICK, J.**

{¶1} Mother-appellant, Angela G. ("Angela"), appeals the November 14, 2022 judgment of the Hancock County Common Pleas Court, Juvenile Division, granting permanent custody of her child, I.G., to the Hancock County Job and Family Services – Children's Protective Services Unit ("CPSU"). On appeal, Angela argues that the trial court's decision granting permanent custody was against the manifest weight of the evidence, that the trial court erred by determining that it was in I.G.'s best interest to grant CPSU's permanent custody motion, and that the trial court erred by finding that CPSU had made reasonable efforts to reunify Angela and I.G. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} I.G. was born in early 2020 to Angela and an unknown father. In mid-March of 2021, I.G. was initially removed from his mother's care by the Findlay Police Department, after Angela and I.G. appeared at the Blanchard Valley Hospital as a result of Angela having paranoid thoughts. Angela was admitted to the hospital's psychiatric unit at that time. As there were no available family members to care for I.G., CPSU took I.G. into the agency's custody.

{¶3} On March 15, 2021, a complaint was filed in the Juvenile Division of the Hancock County Court of Common Pleas, alleging that I.G. was a neglected and

dependent child. A shelter care hearing was held that same date. At that time, I.G. was placed in the emergency temporary custody of CPSU.

{¶4} On May 20, 2021, an adjudicatory hearing was held. As a result, I.G. was adjudicated a dependent child, and the neglect allegation was dismissed. A dispositional hearing was held that same date and I.G. was ordered to be placed in the temporary custody of CPSU. The court also ordered that a case plan filed by CPSU on April 5, 2021 be adopted and take effect.

{¶5} On July 8, 2022, CPSU filed a motion for permanent custody of I.G. An evidentiary hearing was held on that motion on October 25, 2022. At the hearing, CPSU presented the testimony of four witnesses and introduced nine exhibits. Angela presented the testimony of three witnesses.

{¶6} On November 14, 2022, the trial court filed a lengthy and detailed judgment entry, in which the trial court reviewed the record of the case and summarized the evidence presented at the October 25, 2022 hearing. After conducting that review, the trial court found that I.G. had been in CPSU's custody for twelve or more months of a consecutive 22-month period, that I.G. could not, and should not, be placed with Angela within a reasonable period of time, and that it was in I.G.'s best interest for CPSU to be granted permanent custody. For those reasons, the trial court granted CPSU's motion for permanent custody and terminated Angela's parental rights.

**{¶7}** On November 22, 2022, Angela filed the instant appeal.

*Evidence Presented at the October 25, 2022 Hearing*

**{¶8}** At the permanent custody hearing held on October 25, 2022, the first witness called by CPSU was Rose Vanderveer of Findlay, Ohio. Vanderveer testified that she had been a babysitter for I.G. from the time he was three months of age. Then, in March of 2021, Vanderveer began caring for I.G. pursuant to a kinship placement following CPSU having been granted temporary custody of I.G. When I.G. was placed with Vanderveer in March of 2021, I.G. was not meeting developmental milestones. I.G. was very dirty when he arrived at Vanderveer's home. I.G. also had scabies and needed medical care to remedy the skin condition. At that time, I.G. was over a year old and should have been eating baby food or other soft foods. However, other than cereal, I.G. did not know how to eat food and primarily still took nourishment from a bottle. Once I.G. was in Vanderveer's full-time care, I.G. began to thrive in response to Vanderveer's efforts. I.G. learned how to eat table foods, he started talking, and he learned to walk. I.G.'s scabies cleared up and he cried much less frequently.

**{¶9}** During the time Vanderveer was caring for I.G. pursuant to the kinship placement, Angela had a one-hour visitation with I.G. two times per week at Vanderveer's home. Vanderveer would pick up Angela because Angela had no car. During Angela's visits, Vanderveer noticed that there was very little bonding

between I.G. and Angela. For example, Angela would want I.G. to sit on her lap but I.G., being an active child, would want to get down to play and Angela would not play with I.G. As I.G. got older, he would want to go outside, and Angela would go outside with I.G. for a few minutes, but then she would come back in the house. During the visits, Angela was frequently on her phone, or she would watch television, while I.G. would want to go outside and play with his friends, something in which Angela was not interested.

{¶10} At that time, Angela was working as an "escort" and much of the time Angela spent on the phone during those visits was spent texting her "clients". During Angela's visits, Vanderveer's husband would go outside to play with I.G., since Angela typically would not. On the occasions that Angela did briefly go outside with I.G., Angela would stand on the porch or sit on the glider, as opposed to interacting with I.G. or providing I.G. with the assistance that he needed as he played, given his young age. On several occasions, Angela cut short her allotted visitation time because I.G. would want to play outside and Angela was not interested in going outside with I.G.

{¶11} Vanderveer testified that when Angela first began the visitation, I.G. would be very excited to see his mother when she arrived. However, for the last five or six months that I.G. resided with the Vanderveers, I.G. did not much

acknowledge his mother. I.G. would also not react at all to Angela leaving after her visits.

{¶12} Vanderveer also testified that, in the couple of months prior to the permanent custody hearing, Angela had moved away from Findlay and began living in Toledo. Angela told Vanderveer that the move to Toledo was because that was where Angela could get an apartment. Angela then asked Vanderveer to pick her up in Toledo for visitation with I.G. but Vanderveer was unable to do so because of the distance. Vanderveer testified that, prior to Angela moving to Toledo, she had lived at the City Mission more often than not, but sometimes Angela couch surfed and stayed with friends.

{¶13} In late July or early August of 2022, a foster placement was arranged for I.G., as Vanderveer was concerned that she was too old to provide a two-year old with the stimulation he needed. So I.G. began spending time with his foster family in short increments, which increased as time went on. By the time of the permanent custody hearing, I.G. was living with the foster parents full time. While Vanderveer had to provide transportation for Angela's visitation with I.G. for most of the time I.G. was in Vanderveer's care, Angela did get a car three or four weeks before I.G. went into foster care and Angela was then able to drive herself to visitation.

{¶14} The second witness called by CPSU was Elizabeth Welty, a case manager at Harmony House, where supervised visitation is provided for families affected by domestic violence, separation, and divorce. As a case manager, Welty's job is to facilitate those supervised visits. Primarily Welty ensures that the environment is safe for the children and other clients, but Welty also assists in preparing visitation schedules, monitoring visitations, and compiling monthly progress reports.

{¶15} During the pendency of this case, Angela became a Harmony House client, and Welty handled the intake and scheduling of Angela's visitation with I.G. Angela's first and only visit with I.G. at Harmony House was on September 21, 2022. By October of 2022, Angela's visits with I.G. were suspended due to Angela missing two consecutive visits, in violation of Harmony House rules. Welty further testified that the one visit that Angela did complete went well, and both Angela and I.G. seemed happy. Welty testified that there seemed to be at least some kind of a bond between Angela and I.G., although I.G. did go to the door a couple of times during visitation and tried to leave the room. Welty also testified that it was Harmony House policy that parents not have phones with them during visitations there.

{¶16} The third witness called by CPSU was Tammy Alvarado, a caseworker with Hancock County Children's Services who was assigned to I.G.'s case.

Alvarado identified a certified copy of I.G.'s birth certificate, confirming his date of birth in early 2020 to Angela and an unknown father. Alvarado testified that the agency became involved with Angela and I.G. in March of 2021 when Angela went to the Blanchard Valley Hospital emergency room because she was feeling ill and had mental health concerns. At that time, Angela was admitted to Orchard Hall, a mental health assistance program. Children's Services was called and Alvarado was the on-call staff member. Alvarado attempted to work with Angela to find a family member to care for I.G., but Angela's two sisters were not able to do so. Angela then suggested Rose Vanderveer, who was I.G.'s babysitter at the time. I.G. was then placed with Vanderveer, and the agency filed for emergency temporary custody of I.G. on March 15, 2021, which was granted that same date.

{¶17} Alvarado testified that on June 14, 2021, I.G. was determined by the court to be dependent and the agency's temporary custody of I.G. was continued. I.G. had remained in the agency's custody since that time. Alvarado also identified the complaint for permanent custody of I.G. that had subsequently been filed by the agency. Alvarado testified that the agency felt it was necessary to file for permanent custody because I.G. was in need of permanency and because the agency could not recommend reunification due to Angela's lack of progress with the case plan.

{¶18} Alvarado testified that based upon her training and education, she believed that permanent custody was the least restrictive alternative for I.G. at the

time of the hearing, noting that I.G. had been in agency custody for over a year and a half, first in kinship care with Rose Vanderveer and then in foster placement since August of 2022. Alvarado testified that I.G. needed stability. The agency initially looked into Angela's two sisters as placement possibilities for I.G., but one sister was not approved by the agency and the other sister was not able to care for I.G. The agency also attempted to find additional relatives who might be able to take I.G., but the agency was unsuccessful in that search and could find no family members who were appropriate for placement.

{¶19} During her testimony, Alvarado also identified the written family case plan for Angela and I.G. that had been filed stamped on April 5, 2021. Alvarado testified that the goal of the case plan was reunification and that the case plan was reasonably calculated to accomplish that goal. Pursuant to the case plan, the agency requested that Angela address a series of concerns through services that would be provided to assist Angela with her mental health, parenting, and locating safe and stable housing.

{¶20} Regarding the mental health concerns, Angela began attending telehealth meetings with a counselor, and still continued to attend those at the time of the hearing. However, Alvarado testified that the agency had concerns regarding medication compliance on Angela's part, noting that it was discovered in July of 2022 that Angela was not taking her daily anti-anxiety medication as required.

Additionally, Alvarado noted that Angela had been to the emergency room on September 7, 2022 and again on September 10, 2022, both times for mental health concerns. On both of those occasions, Angela refused to be admitted to Orchard Hall, and so she left the hospital and returned home.

{¶21} Alvarado testified that Angela was also very impulsive. Angela had called Alvarado in May of 2022 and, at that time, Angela informed Alvarado that Angela wanted to give I.G. up for adoption. Then, a few days later, Angela called again and said that she wanted to fight to keep I.G.

{¶22} Alvarado testified that, as part of the family case plan, Angela was also asked to attend parenting classes. That request was made when the case was opened in March of 2021 and Angela did not engage in parenting classes until the middle of September of 2022. At the time of the permanent custody hearing, Angela had not yet completed the parenting classes.

{¶23} The last objective of the case plan was that Angela obtain safe and stable housing. Alvarado testified that Angela had struggled with homelessness during the time that the agency had been involved with Angela and I.G. Angela had continually been homeless during that period, moving from place to place every month or every couple of weeks. In April of 2022, Angela had obtained an apartment in North Baltimore, but she was only able to maintain that apartment for a month. After that, Angela was homeless again until the middle of September of

2022, when she found another apartment. While Angela had obtained an apartment in Toledo approximately six weeks before the permanent custody hearing, Alvarado testified that the agency was concerned about Angela's ability to keep that residence, based on the fact that while Angela had begun receiving a monthly SSI disability benefit, the amount of the monthly benefit was insufficient to cover Angela's monthly expenses for housing and other necessities.

{¶24} In her testimony at the hearing, Alvarado also noted that Angela had tried to obtain employment in the past, but had not been able to maintain any employment. Alvarado explained that Angela had worked for several different companies, where she would work for a few days and then end up quitting.

{¶25} Alvarado further testified that she had observed four different occasions when Angela and I.G. had visitation over the course of the agency's involvement. Alvarado testified that Angela loves I.G. but that I.G. is indifferent to his mother, and that they did not appear to have much of a bond. Alvarado also noted that Angela had not even made enough progress with her case plan to move from supervised visitation to unsupervised visitation. Alvarado testified that I.G. needed a safe and stable home environment and that a grant of permanent custody to the agency was the least restrictive alternative available. It was noted that I.G. was very bonded with his foster family, and that he reciprocated the loving attitude

displayed towards him by his foster family. Alvarado testified that the foster family was willing to adopt I.G. if that were a possibility.

{¶26} The fourth and final witness called by CPSU was Kelli Miller, a supervisor and adoption assessor with Hancock County Job and Family Services. In that position, Miller assesses potential families for the adoption process to determine what would be the best fit for a child. Through her employment, Miller became familiar with I.G. Miller testified that I.G. was two years old, developmentally on track, but in need of a safe, stable, permanent home. Based on her education, training, and knowledge of I.G., Miller opined that I.G. would definitely benefit from being placed in an adoptive home and Miller testified that she felt it was one hundred percent certain that I.G. would be adopted. Miller noted that I.G.'s current placement had become certified foster parents just for the possibility of adopting I.G., and that there were adoption subsidies available to assist a potential adoptive family in the adoption process.

{¶27} Miller also testified that she had completed a home visit with Angela on October 13, 2022, at Angela's apartment in Toledo. Subsequent to that, the agency received information that Angela's mother was also living in the apartment. Because Angela's mother has significant mental health issues of her own, Miller testified that Angela's mother moving in with Angela was concerning to the agency, as was the fact that it was a one-bedroom apartment and would be very cramped if

Angela, her mother, and I.G. were to all be living there. Miller noted that, during her visit, the apartment was clean, but very hot, and Angela stated that she had no control over the heating and the cooling. During the home visit, Miller also asked Angela about her medication and requested to see the pill bottles. Upon examining the bottles that Angela produced, Miller realized that the number of pills in Angela's possession with regard to some of the prescriptions was not the quantity of pills that Angela should have if she were taking her medication as prescribed.

{¶28} During that home visit, Miller also spoke to Angela about her finances, and Miller ascertained that Angela's housing and other necessary monthly expenses exceeded Angela's monthly income. Angela told Miller that Angela was using a large stipend that she had received for back pay on her Social Security in order to pay for expenses until she could obtain new employment. However, at the time of that meeting with Miller on October 13, 2022, Angela had not yet started looking for a job. Based on those factors, particularly Angela's living over her budget, Miller testified that the agency had concerns that Angela would not be able to afford her rent, could possibly be evicted, and would be back to bouncing from friend to friend and not have stable housing.

{¶29} Miller testified that, during that same home visit, Angela also attempted to tell Miller that Angela had missed visitation with I.G. due to scheduling issues with the visitation. Notwithstanding the clear rules, previously explained to

Angela, that visitation at Harmony House was the same day and time every week, Angela told Miller that the visitation could be scheduled whenever Angela wanted to go and whenever I.G. was available. Miller testified that she had trouble getting Angela to understand that Harmony House's visitation scheduling did not work like that.

**{¶30}** Finally, Miller testified that she spoke with Angela about Angela's mental health. Angela stated that she was schizoaffective bipolar, and that she heard voices in her head but that the voices had gotten a little bit better. During the visit on October 13, 2022, Angela was playing Christmas music rather loudly, and stated that she plays loud music to drown out the voices.

**{¶31}** Following Miller's testimony, CPSU moved for admission of its 9 exhibits, which was granted, and CPSU rested.

**{¶32}** Three witnesses were then called to testify on Angela's behalf. The first of those witnesses was Michelle G. ("Michelle"), Angela's mother. Michelle testified that Angela was very conscientious and meticulous about things, particularly her house. Michelle stated that Angela always made sure the dishes were done, that the house was clean, and that I.G. had proper clothing. Michelle testified that, at the time of the hearing, she was temporarily living with Angela. Michelle testified that the house where Angela was living looked very nice, and that Angela had decorated it very beautifully, using her back disability pay to buy

furniture. Michelle indicated that Angela wanted I.G. to go to a Christian school, that Angela would make sure that I.G. went to church, and would make sure that I.G. had proper friends.

{¶33} When Michelle was asked if she had ever had the opportunity to see Angela with I.G., Michelle testified that she had, when I.G. was first born. Michelle described Angela as a strict but very loving mother. Michelle testified that Angela always made sure that I.G. ate and that Angela took care to protect I.G. from harm around the home. Michelle said that Angela and I.G. did appear to very much have a bond between them. Michelle testified that Angela held I.G. frequently and always made sure that I.G. watched appropriate television.

{¶34} On cross-examination, Michelle confirmed that the last time she had seen Angela interact with I.G. had been in 2020, when I.G. was just a few months old. Michelle confirmed that Angela would report that she was hearing voices but that those problems seemed to be improving because Angela was diligent about taking her pills. Michelle stated that she herself was in mental health treatment, having been diagnosed with schizophrenia spectrum. On re-direct examination, Michelle testified that the worst thing she had ever observed about Angela's parenting abilities was that Angela maybe spent too much time on herself.

{¶35} The second witness called on Angela's behalf was Amanda Snyder, who described herself as Angela's best friend since elementary school. Snyder

testified that after I.G. was born but before he was removed from Angela's care, Snyder never had the chance to see Angela interact with I.G. because Snyder lived in Carey and Angela lived in Findlay, and so the two did not visit much. Snyder did, however, take Angela to a visit with I.G. about six months prior to the permanent custody hearing. At that time, I.G. approached Angela, called her "momma" a couple times, and Angela sat I.G. on her lap and commented on how adorable he was. I.G. then went off to play with the two other little kids who were there, being two young children whom Rose Vanderveer was babysitting at the time. Snyder testified that I.G. seemed happy to see his mother during that visit and Snyder described the interaction between Angela and I.G. as "really good."

**{¶36}** Snyder testified that she has three children of her own, who were seven, eight, and ten at the time of the hearing. Angela had spent quite a bit of time with Snyder's children without Snyder being present, and Snyder had no concerns about her children being with Angela. Snyder had been to Angela's new place and testified that it seemed very safe for children and very clean. Snyder further testified that Angela had consistently lived with her for a year and a half, since March of 2021, and that she had helped Angela get an apartment in North Baltimore but that Angela did not live at that apartment very long because of financial issues. Finally, Snyder testified that Angela had been taking her meds every single day and had been normal and fine in terms of her mental health.

{¶37} Finally, Angela took the stand. Regarding I.G.'s initial removal from her care, Angela testified that she had been hearing voices and so she called 9-1-1 to get help, which led to Angela being at the hospital and then I.G. being removed. Angela acknowledged that she also had financial issues at the time and was working as an escort. However, Angela testified that she had stopped doing escort work about a month before the permanent custody hearing because she did not want to expose I.G. to that.

{¶38} Angela testified that she had been in her current residence for one month. Angela confirmed that, over time, she had been homeless and that she also used to couch surf frequently. Angela indicated that she had lived with her best friend, Mandy Snyder, for a month or two prior to getting the current apartment.

{¶39} Through her testimony, Angela indicated an awareness and understanding of the case plan for reunification that had been developed by the agency. Angela acknowledged that there had been times during the history of the case that she thought it might be best if I.G. were to be adopted, particularly when Angela was homeless. Angela testified that, however, since she had recently got her own place and things began to go well for her, she changed her mind and decided that she wanted to work on the case plan.

{¶40} Angela testified that, other than one two-week lapse, she had been seeing a mental health counselor the entire time since the case had been opened,

once per week, and that was going very well. Angela indicated that she was fully compliant with her three medication prescriptions and she testified that any surplus of medication was due to the hospital providing her with extra. Angela testified that the medication really helped with the voices that she hears, and the voices were much better at the time of the hearing.

{¶41} Angela testified that she had failed to attend parenting classes for most of the pendency of the case, but then had recently decided that she should complete the classes as best she could, and so she started attending the classes in September of 2022. At the time of the permanent custody hearing, Angela had three parenting classes left to complete.

{¶42} Angela testified that she felt it was normal for her son to want to go play during their visits, and she denied spending excessive time on her phone. Angela also testified that she had enrolled in college at the University of Phoenix, was studying social work, and had a 3.8 grade point average. While she was currently on disability and not employed, Angela testified that she believed that she could get extra disability payments if she had her son, meaning she would have double the income to help with her living expenses. She testified that she was also looking for a job but acknowledged that she was not the best employee due to her mental health problems. Finally, Angela testified that she loves her son and wanted custody of him, even though she had made mistakes in the past.

**First Assignment of Error**

**The trial court's decision is against the manifest weight of the evidence as the agency did not prove by clear and convincing evidence that the agency should be granted permanent custody of the minor child.**

**Second Assignment of Error**

**The trial court abused its discretion in finding that permanent custody to the agency was in the minor child's best interest.**

**Third Assignment of Error**

**The trial court committed prejudicial error in finding that the agency made reasonable efforts for the minor child to return to the custody of appellant-mother.**

{¶43} We elect to address the three assignments of error together.

{¶44} "[T]he right to raise one's children is an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *Id.* quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under the circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested." *In*

*re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, at ¶ 6.

**{¶45}** "Decisions concerning child custody matters lie within the sound discretion of the trial court and will not be reversed unless the trial court abused its discretion." *In re Leveck*, *supra*, ¶ 7, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). An abuse of discretion involves more than a mere error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "In reviewing this exercise of discretion, appellate courts must adhere to 'every reasonable presumption in favor of the lower court's judgment and finding of facts.'" *In re Leveck*, *supra*, at ¶ 7, quoting *In re Brodbeck*, 97 Ohio App.3d 652, 659, 647 N.E.2d 240 (1994).

**{¶46}** "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08, 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. Specifically, "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion

for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

**{¶47}** "The first prong of that test requires a finding by clear and convincing evidence that one of the statutorily-prescribed situations of R.C. 2151.414(B)(1) is satisfied." *In re N.F.*, 3d Dist. Marion No. 9-22-40, 2023-Ohio-566, ¶ 19. In that respect, R.C. 2151.414 provides:

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**

**(c)   The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.**

**(e)   The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.**

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.**

{¶48} Then, in determining the best interest of the child, R.C. 2151.414(D) directs the trial court to consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure

-22-

permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶49} Pursuant to R.C. 2151.414(B)(1), an award of permanent custody must be based on clear and convincing evidence. *In re H.M.* 3d Dist. Logan No. 8-18-46, 2019-Ohio-3721, ¶ 44. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477.

{¶50} In reviewing whether a trial court's permanent custody decision is against the manifest weight of the evidence, an appellate court """"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."""" *Eastley v. Volkman*, 132 Ohio St.3d

328, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9ᵗʰ Dist. 2001), quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). Furthermore, "'[w]eight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier-of-fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."'" (Emphasis *sic*.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed. 1990).

**{¶51}** Finally, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier-of-fact. *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis *sic*.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). "'Thus, if the children services agency presented competent

and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence.'" *In re A.B.*, 3d Dist. Marion No. 9-22-12, 2022-Ohio-4234, ¶ 12, quoting *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

**{¶52}** In the instant case, with regard to the first prong of the two-prong test, the trial court found by clear and convincing evidence that, among other things, I.G. had been in the temporary custody of CPSU since May 20, 2021. Thus, as the trial court also found, I.G. had been in CPSU's temporary custody for more than 12 months pursuant to R.C. 2151.414(B)(1)(d), sometimes referred to as the "12 in 22" standard. Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 3d Dist. Marion Nos. 9-13–43, 9–13–44, 9-13-45, 2014-Ohio-1136, ¶ 30, citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14.

**{¶53}** On appeal, Angela does not dispute the trial court's "12 in 22" finding, which is supported by the record. Therefore, we move on to consider whether the

trial court's best-interest of the child finding is also supported by clear and convincing evidence.

{¶54} In its decision, the trial court made comprehensive findings, with reference to the evidence presented, as to each of the statutory best-interest factors, as follows:

**A.    R.C. 2151.414(D)(1)(a): the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child.**

**The child has been removed from his home since March 13, 2021.  He has been moved once from a kinship placement into a foster home with foster parents that became certified as foster parents specifically to care for [I.G.].  He thrived in his kinship placement where he was taught to eat baby food, began to talk and walk.   He was very bonded to his caregiver who acknowledged that she would not be able to care for him long term.  In his foster home, [I.G.] is reportedly doing very well and is bonded with his foster parents.**

**Contrarily, [I.G.] does not appear to be bonded with [Angela]. [Angela] would spend much of her time during visitations on her phone or watching television.  Once visitations started at Harmony House, the one visit that occurred appeared to go well.  It is interesting that [Angela] was not permitted to bring a phone into the visit.  Given the choice, it appears that [Angela] will choose her phone or other distraction instead of caring for [I.G.].**

**The Court finds that this factor points to granting permanent custody as being in the child's best interest.**

**B.    R.C. 2151.414(D)(1)(b): the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child.**

**The child is too young to state his wishes with complete understanding of the question.**

**C.    R.C. 2151.414(D)(1)(c): the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(10) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.**

**The child has been in the temporary custody of CPSU for more than twelve months and** [Angela] **has failed to remedy the situation that caused the child to be removed.  This factor points to granting permanent custody.**

**D.    R.C. 2151.414(D)(1)(d): the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.**

**Alvarado and Miller testified that the child is in need of a legally secure and permanent placement and that such a placement is not achievable without the granting of the motion for permanent custody.** [Angela's] **recent engagement in the case plan does not appear to be genuine.  She is still experiencing concerning mental health symptoms including impulsive behavior that directly effects** [*sic*] [Angela's] **ability to parent** [I.G.] **effectively.  This factor points to granting permanent custody as being in the child's best interest.**

(Nov. 14, 2022 Judgment Entry, Docket # 64).  The trial court further found that

none of the factors set forth in R.C. 2151.414(E)(7) through (11) were applicable to

this case, a finding that is also supported by the record. (*Id*.).  As a result of that analysis, the trial court found by clear and convincing evidence that an award of permanent custody to CPSU was in I.G.'s best interest.

{¶55} Upon our independent review of the record, we find that the trial court took all relevant evidence into account and applied the appropriate statutory factors. The evidence was clear that I.G. had thrived in his kinship and foster care placements.  I.G. improved substantially from the physical condition and somewhat delayed state of development that he was in when CPSU first assumed temporary custody.  While the testimony did indicate that I.G. and Angela had a friendly relationship, and that Angela seemed to love I.G., it appeared that I.G. did not share a loving and bonded relationship with his mother, based on the observations of their interactions as testified to by various witnesses.

{¶56} More importantly, I.G. had been in the temporary custody of the agency for well over a year and there was no indication from the evidence presented that I.G. could be returned to Angela at any time in the near future.  Angela had made some effort with her mental health counseling, but with less than satisfactory results, particularly as the home visit in October of 2022 revealed that Angela was playing Christmas music to drown out the voices that she was still hearing.  Angela had failed to complete the mandated parenting classes and, in fact, delayed even beginning the classes for nearly eighteen months' time.  Angela was homeless for

nearly the entire time that I.G. had been removed from her care, and Angela had demonstrated that she was unable to obtain and maintain gainful employment or otherwise financially provide for I.G.'s basic care. I.G. needed permanency and a stable and secure home and there was no indication that Angela could provide that for him, notwithstanding Angela's testimony that she loved her son and the evidence that she had made some last minute efforts to comply with the case plan when the permanent custody hearing date was looming.

{¶57} Upon considering all relevant factors, and remaining mindful that the trial court's judgment may have been based upon observing the demeanor of witnesses and other nuances that do not translate to the written record, we find that the trial court's decision regarding permanent custody was supported by clear and convincing evidence and, in particular, the trial court did not err in determining that it was in the best interest of I.G. to grant permanent custody to the agency. Further, we are unable to find that the trial court's determination to grant the motion for permanent custody of I.G. was against the manifest weight of the evidence.

{¶58} Therefore, Angela's first and second assignments of error are overruled.

{¶59} Lastly, Angela argues on appeal that the trial court erred by finding that CPSU had engaged in reasonable efforts toward reunifying Angela and I.G.

{¶60} As this court recently explained in *In re S.P.*, 3d Dist. Hancock No. 5-21-25, 2022-Ohio-576, at ¶ 36- 37:

> "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 29. R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *." *In re C.F.* at ¶ 41; *accord In re R.R.*, 3d Dist. Logan No. 8-20-26, 2021-Ohio-1620, at ¶ 78. Notably, the Ohio Supreme Court concluded that "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30. Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶ 42. Additionally, "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.
>
> In *In re R.R.*, 3d Dist. Logan No. 8-20-26, 2021-Ohio-1620, this Court applied the Ohio Supreme Court's holding in *In re C.F.* This Court held that because the trial court previously made reasonable-efforts findings, the Agency was not required to prove, nor was the trial court required to find, that the Agency used reasonable efforts to reunify Mother with her child before the trial court could grant permanent custody of the child to the Agency. *Id.* at ¶ 79.

**{¶61}** In the case before us, the record reflects that the trial court made a reasonable-efforts finding prior to the permanent custody hearing. (See Mar. 15, 2021 Judgment Entry, Docket No. 7).  The trial court therefore did not need to again find that CPSU used reasonable efforts toward reunification before the trial court could grant permanent custody of I.G. to CPSU.

**{¶62}** However, while not required to do so, the trial court made an additional reasonable-efforts finding when ruling on the motion for permanent custody, as follows:

> **The Court finds that reasonable efforts have been made by CPSU in that the following services have been made to the parent including visitation, transportation, mental health treatment and assessments, housing referrals, utility assistance, vehicle repairs and parent education.  The Court finds further that reasonable efforts to finalize a permanency plan have been made by CPSU in that they have conducted a search for relatives and have filed for permanent custody.**

(Nov. 14, 2022 Judgment Entry, Docket No. 64). A review of the record reveals that the overall evidence before the trial court that supported that finding

**{¶63}** For those reasons, we overrule Angela's third assignment of error.

**{¶64}** Having found no error prejudicial to the mother-appellant in the particulars assigned and argued, the judgment of the Hancock County Court of Common Pleas, Juvenile Division, is affirmed.

*Judgment Affirmed*

**MILLER, P.J. and ZIMMERMAN, J., concur.**