[Cite as *In re S.M.*, 2024-Ohio-517.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:                                                    CASE NO. 9-23-30

    S.M.

[LINDSEY M - APPELLANT]                    **O P I N I O N**
[SAMUEL M. - APPELLANT]

Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2020 AB 0026

**Judgment Affirmed**

**Date of Decision: February 12, 2024**

**APPEARANCES:**

    *W. Joseph Edwards* **for Appellant Lindsey M.**

    *Alison Boggs* **for Appellant Samuel M.**

    *Charles R. Hall Jr.* **for Appellee**

**WALDICK, J.**

{¶1} Mother-appellant, Lindsey M. ("Lindsey"), and father-appellant, Samuel M. ("Samuel") appeal the May 1, 2023 judgment of the Marion County Common Pleas Court, Family Division, granting permanent custody of their child, S.M., to the appellee, Marion County Children Services ("MCCS" or "the agency"). On appeal, both Lindsey and Samuel argue that the trial court's decision granting permanent custody to the agency was against the manifest weight of the evidence, and that the trial court erred in failing to make an adequate record of the permanent custody hearing. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} In late 2019, S.M., a male, was born to Lindsey and Samuel, who are unwed. On January 30, 2020, MCCS filed a motion in the Marion County Court of Common Pleas, Family Division, seeking an ex parte emergency order for temporary custody of S.M, which the trial court granted on January 31, 2020.

{¶3} On February 4, 2020, the agency filed a complaint alleging that S.M. was an abused, neglected, and dependent child. The abuse, dependency, and neglect allegations in the complaint were based on S.M.'s mother, Lindsey, having tested positive for THC at the time of S.M.'s birth, and S.M.'s meconium also testing positive for THC. The complaint asserted that S.M. was born with several serious medical issues for which he was undergoing testing and treatment. The complaint further alleged that Lindsey had fled

from Massachusetts where she had previously lost custody of four other children, and that Lindsey had reported that S.M.'s father, Samuel, struggled with heavy drug use.

{¶4} On March 6, 2020, the trial court ordered that a case plan submitted by MCCS on February 28, 2020 be adopted and take effect.

{¶5} On July 30, 2020, the agency filed a second complaint alleging that S.M. was an abused, neglected, and dependent child, on the same grounds as those alleged in the initial complaint.

{¶6} On or about August 28, 2020, an adjudicatory hearing was held. By judgment entry filed on September 29, 2020, the trial court found S.M. to be an abused and dependent child.

{¶7} On September 25, 2020, a dispositional hearing was held. By judgment entry filed on October 8, 2020, MCCS was ordered to be maintained as the temporary custodian of S.M., and it was ordered that S.M. continue in his foster care placement.

{¶8} On June 8, 2022, the agency filed a motion for permanent custody of S.M. A permanent custody hearing was then held on three different dates between April 13, 2023 and April 27, 2023.

{¶9} On May 1, 2023, the trial court filed a lengthy judgment entry in which the court reviewed the record of the case and detailed the evidence presented at the multi-day permanent custody hearing. After conducting that review, the trial court found that S.M. had been in the agency's custody for twelve or more months of a consecutive twenty-two-

month period, that the agency had made reasonable efforts to reunify S.M. with his parents, and that it was in the best interest of S.M. that MCCS be granted permanent custody. For those reasons, the trial court granted the agency's motion for permanent custody and terminated the parental rights of Lindsey and Samuel as to S.M.

{¶10} Both Lindsey and Samuel have appealed the trial court's decision. A separate merit brief has been filed by each parent, although both of them raise the same two assignments of error, as set forth below.

### Lindsey's First Assignment of Error

**The trial court abused its discretion in granting permanent custody to Marion County Children's Services, and the decision was against the manifest weight of the evidence.**

### Lindsey's Second Assignment of Error

**The trial court failed to make an adequate record pursuant to Appellate Rule 9(A)(2) resulting in a violation of Ms. [M]'s due process rights.**

### Samuel's First Assignment of Error

**The trial court's decision granting permanent custody was against the manifest weight of the evidence and amounted to an abuse of discretion.**

### Samuel's Second Assignment of Error

**The trial court failed to make an adequate record pursuant to Appellate Rule 9(A)(2) resulting in a violation of Mr. [M]'s due process.**

{¶11} To avoid unnecessary repetition in our analysis of these claims, we shall jointly address the parallel assignments of error.

*First Assignments of Error*

**{¶12}** In the first assignments of error, Lindsey and Samuel argue that the trial court's decision terminating their parental rights and granting permanent custody to the agency was against the weight of the evidence.

**{¶13}** "[T]he right to raise one's children is an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *Id.* quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under the circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested." *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 6.

**{¶14}** "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. Specifically, "R.C.

2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶15} "The first prong of that test requires a finding by clear and convincing evidence that one of the statutorily-prescribed situations of R.C. 2151.414(B)(1) is satisfied." *In re N.F.*, 3d Dist. Marion No. 9-22-40, 2023-Ohio-566, ¶ 19.  In that respect, R.C. 2151.414 provides:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶16} Then, in determining the best interest of the child, R.C. 2151.414(D) directs the trial court to consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶17} Pursuant to R.C. 2151.414(B)(1), an award of permanent custody must be based on clear and convincing evidence. *In re H.M.* 3d Dist. Logan No. 8-18-46, 2019-Ohio-3721, ¶ 44. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477.

{¶18} In reviewing whether a trial court's permanent custody decision is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001). Furthermore, "'[w]eight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier-of-fact] that the party having the burden of proof will be

entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.""" (Emphasis *sic*.)  *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed. 1990).

{¶19} Finally, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier-of-fact. *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).  Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.)  *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).  "'Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence.'" *In re A.B.*, 3d Dist. Marion No. 9-22-12, 2022-Ohio-4234, ¶ 12, quoting *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶20} In the instant case, with regard to the first prong of the two-prong test, the trial court found by clear and convincing evidence that S.M. had been in the agency's temporary custody for twelve or more months of a consecutive twenty-two-month period. Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's

temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 3d Dist. Marion Nos. 9-13–43, 9–13–44, and 9-13-45, 2014-Ohio-1136, ¶ 30, citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14.

{¶21} On appeal, Lindsey and Samuel do not dispute that MCCS satisfied the R.C. 2151.414(B)(1)(d) "12 in 22-standard", a finding which is also supported by the record. Therefore, we move on to consider whether the finding of the trial court as to the best interest of the child is also supported by clear and convincing evidence.

*Evidence Presented at the Permanent Custody Hearing*

{¶22} At the permanent custody hearing, MCCS called seven witnesses in support of the agency's case.

{¶23} Dr. Katelyn Krivchenia, a pediatric pulmonologist employed at Nationwide Children's Hospital in Columbus, Ohio and an expert in childhood lung disease, testified that S.M. had been under her care for two and a half years. S.M. is a "medically fragile" child, born with an interstitial lung disease that was subsequently diagnosed as Chitayat Syndrome, a very rare syndrome caused by a mutation in a gene. At this stage of his life, S.M. requires supplemental oxygen in order to breathe and is also dependent on a feeding tube. Dr. Krivchenia testified that some persons born with the same disorder will improve

over time and require less or no supplemental oxygen, while others can require more and more supplemental oxygen in order to breathe.

{¶24} Dr. Krivchenia testified that S.M. spent the first 54 days of his life in the hospital, then went home with his foster parents, but had been readmitted to the hospital twice since then to address his medical needs. As S.M. is now an active toddler who plays and runs around the house, his lungs require more oxygen than at birth, as such activities make breathing more challenging for him. Dr. Krivchenia testified that, without question, S.M. needs supplemental oxygen at all times at this point in his life. When S.M. is without supplemental oxygen, his oxygen levels desaturate below normal for his age. S.M.'s oxygen levels require constant monitoring, and he has a monitor with him at all times.

{¶25} Dr. Krivchenia explained that the monitor is important for S.M.'s well-being as he can very easily fall below a normal oxygen level, which can impact brain development, heart health, and other bodily functions. In spite of that, Dr. Krivchenia was hopeful for S.M.'s future, as he currently gets the oxygen-treatment he needs to fully participate in the various therapies that he requires as he grows. S.M. currently also receives care from genetic experts and cardiologists, and undergoes speech therapy and feeding therapy, among others. Because of S.M.'s lung disease, viral illnesses pose a threat to his well-being, as even catching a cold makes it all the harder for his body to move oxygen from his lungs to his bloodstream.

{¶26} Dr. Krivchenia testified that she understands parents worrying about a child like S.M. being dependent on supplemental oxygen and wanting to wean the child from the supplemental oxygen, but that is not an option at this point for S.M. Without his supplemental oxygen, S.M. is at risk for heart failure, stroke, brain damage, kidney dysfunction, and liver dysfunction. Dr. Krivchenia testified that any future attempt to wean S.M. off the oxygen, when appropriate, must be done in a careful and informed manner, with constant monitoring of his saturation levels.

{¶27} Dr. Krivchenia testified that the tubes used to deliver oxygen to S.M. can be changed out from one oxygen tank to another in two to five seconds. The doctor testified that taking 35 seconds to switch the tubes to a new oxygen tank would be a problem, as it would overly prolong the time necessary for S.M.'s body to receive the oxygen. Dr. Krivchenia confirmed that S.M.'s mother, Lindsey, had undergone training with the doctor in late 2021 relating to S.M.'s use of supplemental oxygen and his monitor.

{¶28} On cross examination by Lindsey's attorney, Dr. Krivchenia acknowledged that she had previously written a letter requesting that S.M. be limited in his exposure to public places, in order to keep him safe, due to the threat level of respiratory viruses at that time. The doctor also testified that, as to the issue of environmental exposure, a big threat to S.M. is exposure to smoke from cigarettes or vaping devices. Even third-hand smoke, which the doctor defined as the smell of smoke lingering on clothes or in the air, could cause inflammation in S.M.'s lungs. Accordingly, the doctor explained that S.M. should

not be exposed to any smoke at all, although third-hand smoke would be less detrimental than second-hand smoke. Dr. Krivchenia confirmed that Lindsey had gone through training at the hospital in both the use of S.M.'s oxygen tank and monitor, and in caring for his feeding tube. At the time of the hearing, the doctor's goal for S.M.'s oxygen level was 94 or higher, which is why his monitor was set to begin beeping if his level falls to 90 or below. Dr. Krivchenia testified that if S.M.'s oxygen level fell into the 70s or lower, bodily harm could result. When S.M.'s level begins to fall, he must be made to stop whatever activity he is doing and take a rest break until his saturation and oxygen levels can be reestablished at safe numbers.

{¶29} During cross examination by Samuel's attorney, Dr. Krivchenia testified that she had not personally been involved in any training with Samuel relating to S.M.'s care, and that she had never met Samuel.

{¶30} On cross examination by the guardian ad litem, Dr. Krivchenia testified that since taking over S.M.'s care in November of 2020, she and her office had received four phone calls from Lindsey. The doctor also testified that anything causing S.M. to become upset, and particularly screaming or crying, can cause drops in his oxygen level because he does not have the same reserves as a child with normal lungs.

{¶31} On re-direct examination, Dr. Krivchenia confirmed that Lindsey had been banned from the hospital at one point due to repeatedly using bad language and yelling at the staff. On re-cross examination by Lindsey's counsel, the doctor testified that three of

the four phone calls received from Lindsey were in October of 2021, January of 2022, and August of 2022, and that Lindsey had not made contact with the doctor for the eight months immediately preceding the hearing. On re-cross examination by the guardian ad litem, Dr. Krivchenia testified that her biggest concern with Lindsey was that even after Lindsey had undergone the training provided by the hospital, the doctor still received reports that Lindsey seemed unable to troubleshoot S.M.'s oxygen desaturations during visitation and even ignored them at times. Upon questioning by the trial court, Dr. Krivchenia confirmed that when S.M.'s oxygen level drops, the risk of damage to his lungs, brain, and other organs would not be apparent by just looking at him.

{¶32} Antigoney Lyons, a visitation supervisor with MCCS, also testified. Lyons supervised parental visitation with S.M. for the three years of his life, following his discharge from the hospital after birth. Lyons testified that S.M. is pretty happy, very sweet, and very active, and that he likes to explore. Because S.M. is deemed medically fragile, the agency makes a point to keep him as safe as possible during in-person visitation. The safety measures include deep cleaning the visitation room before visits with S.M., making sure that S.M. is the only child at the visitation center during his visitation times, and requiring his parents to change from street clothes into scrubs and wear a mask and gloves. Agency employees and S.M.'s foster mother also wear masks during the visits.

{¶33} Lyons explained that S.M.'s parents have separate visitation times with their son. Lindsey's visits are in person, while Samuel participates primarily in virtual audio-

video visits with S.M. Lyons testified that S.M. must have supplemental oxygen at all times, and has a monitor that tracks his oxygen levels and heart rate. S.M.'s required minimum oxygen level for visits with his parents is 90, and the monitor displays a number that indicates S.M.'s oxygen level at any given moment. During S.M.'s visits at the center, Lyons observed that S.M.'s oxygen level would drop when he was active and busy, and also when he was exposed to certain scents. The monitor begins making a noise if the child's oxygen level drops below the set minimum limit. If S.M.'s oxygen level begins to drop, then the oxygen flow from the tank must be turned up. During S.M.'s history of visitation with his mother, Lyons had observed the oxygen tank being changed more than one hundred times. Changing the oxygen tank involves leaving S.M. hooked up to the tank that is getting low, getting the new tank turned on, and then unplugging the tube from the old tank and plugging it into the new tank. Also, his monitor would need to be plugged in upon arrival at the center, because it only has a certain battery life and must be recharged for the nearly one-hour drive home to where his foster parents live.

{¶34} At the hearing, Lyons identified her notes and records documenting the three-year history of parental visitation with S.M., and then testified as to several incidents of note from that history.

{¶35} With regard to S.M.'s visitation with his mother, Lyons noted that on October 5, 2021, Lindsey tried to entertain S.M. with her phone and he was not interested. She changed his diaper on that date, but Lindsey did not want to clean S.M. during that process

and asked for help from the foster mother. Other than that one time, Lindsey did not perform any diaper changes during visitation and it had to be done by the foster mother.

{¶36} On November 16, 2021, S.M.'s oxygen level began to drop during a visit, and Lindsey put him on her lap for a break. Linsdey then unplugged his oxygen cable and the foster mother had to go into the room to make sure the oxygen was back on. Later that same visit, S.M.'s monitor alarmed three separate times before Lindsey looked at it. When the oxygen tank needed switched out, the foster mother had to do it.

{¶37} On January 11, 2022, Lindsey was playing with S.M. when his monitor alarmed. His oxygen level dropped to the low 80s and the foster mother had to go into the room to turn up the oxygen flow. When the monitor alarmed again, the foster mother returned to the room and cracked the window for fresh air, which resulted in Lindsey "going off." Later that same visit, Lindsey unplugged S.M.'s monitor and never plugged it back in. It also took Lindsey over 35 seconds to change the oxygen tank. When Lindsey turned the oxygen on, it was not flowing correctly. The monitor again alarmed during that visit, and Lindsey did nothing for five minutes.

{¶38} On January 18, 2022, the monitor alarmed and it was discovered that Lindsey had failed to plug it into the wall outlet to recharge. Lindsey then started to change the oxygen tank and shut off S.M.'s oxygen flow while doing so. She then again unplugged the monitor and did not plug it back in.

{¶39} On February 1, 2022, the monitor alarmed more than once during the visit and Lindsey failed to check it. Lindsey again failed to plug the monitor into an electrical outlet to charge. During that visit, Lindsey tried to change the oxygen tank and turned off S.M.'s oxygen for more than 30 seconds, at which point the foster mother entered the room to help. Lindsey became enraged, yelled and screamed at the staff, then threw her scrubs, mask, and gloves on the floor and left the building.

{¶40} On February 15, 2022, the monitor alarmed during a visit, and would not stop beeping. Lindsey attempted to change the oxygen tank, but turned off the tank that S.M. was using, and his oxygen level fell to 83 percent. When the foster mother entered the room to provide assistance, Lindsey began cussing and screaming. S.M.'s heartbeat ultimately dropped to 14 beats per minute and the foster mother called for an EMS squad. When the foster mother attempted to leave the visitation room with S.M. to get him help, Lindsey blocked the doorway. Lindsey was asked to leave the building, which she did, after calling Lyons a "fucking bitch" and threatening to grab her by the hair.

{¶41} On May 17, 2022, Lindsey arrived at visitation, brought her clothes into the visitation room with her after changing into scrubs, and the clothes smelled of smoke. The monitor alarmed, and the foster mother opened the window for fresh air and turned up the oxygen flow. Agency supervisors asked Lindsey to remove her clothes from the room, and Lindsey once again began cussing and screaming.

{¶42} On August 30, 2022, the monitor alarmed during a visit and S.M.'s oxygen level dropped to 81, which Lindsey blamed on the air in the room. Lindsey ended the visit early, saying the oxygen tank level was low, which it was not. Lindsey then stated that "this" is a complete waste of her time.

{¶43} On October 5, 2022, the monitor alarmed and S.M.'s oxygen level dropped to 88. The foster mother turned up the oxygen flow, and had S.M. sit down for a break. When the monitor alarmed again, Lindsey had to call the foster mother into the room to fix one of the wires.

{¶44} On November 1, 2022, a virtual visit was held because S.M. was ill. During that visit, Lindsey turned the camera volume off.

{¶45} On September 6, 2022, Lindsey got angry when she was asked to wash her hands prior to entering the room with S.M. Lindsey left the sink running, which soaked the floor, and she threw paper towels all over the sink and floor, which Lyons had to clean up.

{¶46} On February 28, 2023, Lindsey brought her new baby to a visit with S.M. She complained she needed somewhere to put the baby, and so the agency provided a bouncy seat. Lindsey sat and tended to the baby while S.M.'s monitor alarmed and his oxygen level dropped to 82.

**{¶47}** On March 14, 2023, a virtual visit was held at Lindsey's request, due to poor road conditions. During that visit, Lindsey failed to engage with S.M. for the first 12 minutes.

**{¶48}** On March 21, 2023, the guardian ad litem came to observe a visit. Lindsey asked that the visitation center staff come in the room to monitor the machine, stating that the foster mother was lying about S.M.'s oxygen levels dropping.

**{¶49}** As indicated, Lyons had documented repeated instances when Lindsey had become irate with staff members during visitation, raising her voice and swearing at others. Lyons also documented that S.M. would become highly upset as a result, screaming and crying. Another routine occurrence was that Lindsey would try to amuse her son with her cell phone, instead of letting him get off her lap and play with toys or otherwise interact with him. Lyons testified that Lindsey did appear to be bonded with S.M.

**{¶50}** Regarding S.M.'s visitation with his father, Samuel, Lyons testified about two in-person visits that Samuel attended with S.M. at the visitation center. On October 21, 2021, Samuel walked in from across the street where he had been smoking a cigarette, even though the agency had repeatedly requested that he not smoke prior to visits. On that same date, Samuel refused to wash his hands, and also remained on his phone during the visit. On October 28, 2021, Samuel was again smoking before an in-person visit and was reminded to not do so. After the visit started, S.M.'s oxygen level dropped to the low 80s

and he struggled to recover, so the visit ended early. After that point, Samuel's visitation with S.M. took place virtually.

{¶51} On August 18, 2022, a virtual visit was held. Samuel inquired of the foster mother how S.M. was doing after becoming ill with COVID, and the foster mother explained that S.M. was doing better. Samuel then began yelling and cussing on the phone.

{¶52} On September 1, 2022, at the start of a virtual visit, Samuel said hello and then said nothing else. Agency staff prompted Samuel to interact with S.M., and Samuel then began making racist comments to Lyons, who is biracial. Among other things, Samuel referred to himself as a "confederate motherfucker". S.M. was on the phone when those remarks were made.

{¶53} On March 16, 2022, Samuel was smoking during a virtual visit and did not initially engage with S.M. at all on the phone. Samuel finally spoke to S.M. to ask how he was doing, and then stared at S.M. while he played. Samuel then said nothing to S.M. for two minutes, but Samuel was talking to someone in the car with him. Someone in the car with Samuel yelled "goddamnit" and Samuel responded with "fuck."

{¶54} During cross examination by Lindsey's counsel, Lyons testified that S.M.'s foster mother was able to change out the oxygen tank in three to five seconds. Lyons acknowledged that, over the last three years, Lindsey had missed a few visitations but had been compliant for the most part with the visitation schedule. Lyons repeated, and

expanded upon, her prior testimony that Lindsey spent much time during visitation trying to use her cell phone to entertain S.M.

{¶55} During cross examination by Samuel's counsel, Lyons testified that the in-person visits between Samuel and S.M. ended early at the agency's request, due to Dr. Krivchenia's recommendation that visits be stopped if S.M.'s oxygen level does not recover after a minute's time. Lyons also testified about one virtual visit where Samuel kept turning the video off and on. Lyons also explained that Samuel's visits with S.M. were switched to virtual visits because Samuel did not have transportation to attend visits in person.

{¶56} During cross examination by the guardian ad litem, Lyons confirmed that Lindsey had ultimately been prohibited from changing the oxygen tank during visitation. Lyons testified that, based on her observations and interactions with Lindsey, it was Lyon's opinion that Lindsey was not capable of handling the oxygen tank. Lyons testified that while there were many times that Lindsey became irate during visits and acted inappropriately, there were also times when she was sweet and kind. Lyons confirmed that S.M. was bonded with both parents, but also with his foster parents. Lyons testified that the visitations appeared to be very hard on S.M., that in 2023 his oxygen level dropped significantly during every single visit with his mother, and that he would be lethargic and act completely different than normal during the nearly one-hour car ride back to his foster

home, which Lyons provided. Lyons confirmed that during Lindsey's visitations with S.M., it was the foster mother who provided most of the actual care for the child.

{¶57} Ellen Thrush, a supervisor at MCCS, was also called as a witness by the agency. Thrush testified that S.M. was removed from his mother's custody as a newborn, after he was born with marijuana in his system. The agency then also learned that Lindsey had other children, about which she was untruthful in the agency's investigation. Thrush testified that S.M. was very sick at birth and had to be transferred to Nationwide Children's Hospital. S.M. was never released to Lindsey's care following his birth, and Lindsey at one point was asked to quit visiting at the hospital due to her outbursts.

{¶58} During cross examination by Lindsey's counsel, Thrush testified that she had visited Lindsey's current home in Marion and there were no safety concerns. During the visit, Thrush noted that Lindsey had clothing and proper formula for her younger child, and had a bed for S.M., along with some toys for a child his age.

{¶59} In cross examination by Samuel's counsel, Thrush testified that she had very little contact with Samuel.

{¶60} Angela Windle, one of four caseworkers at MCCS who had been assigned to S.M.'s case, also testified for the agency. Windle identified the written case plan that had been implemented in the case, with reunification being the agency's goal.

{¶61} As to Samuel's progress with the case plan, Windle's testimony reflected that he had failed to meet nearly all goals set forth in the plan. Specifically, Samuel had not

signed releases of information requested by the caseworker to monitor progress on the case. Windle testified that Samuel had also failed to develop and maintain appropriate relationships that do not negatively impact S.M., evidenced by the fact that Samuel had never had S.M. on his own and that the agency had been forced to suspend Samuel's visitation due to the language he would use during visits with his son. Windle testified that Samuel had not obtained and maintained appropriate housing for himself and S.M., as Samuel was living at his parents' home where there was no room for S.M. While Samuel had undergone an alcohol and drug assessment as requested, along with a mental health assessment, Windle testified that Samuel's prior fentanyl addiction was a cause of concern as to his ability to care for his son. Samuel had also undergone most of the drug screens requested by the agency, but the most recent results indicated that he was positive for THC. Windle testified that Samuel had not attended parenting classes as required by the case plan, although he had attended training relating to S.M.'s medical care at Nationwide Children's Hospital.

{¶62} As to Lindsey's progress with the case plan, Windle testified that Lindsey had completed all items set forth in the case plan. However, while Lindsey had been compliant with the specified case plan objectives, Windle testified that the agency's concern is that Lindsey is not able to provide the care required by S.M.'s medical condition. Windle testified that the agency's concern in that respect was based on observations made over time during Lindsey's visits with S.M. at the visitation center, as well as Lindsey's

seeming underestimation of both the seriousness of S.M.'s condition and the care that he requires.

{¶63} Windle also testified as to her observations of each parent's interaction with S.M. As to Samuel, Windle testified that he was not extremely focused on interacting with his son during their virtual visits, and gave examples of Samuel riding in a car, stopping at a convenience store, and interacting with other people around him, instead of looking at the screen during the visits. As to Lindsey, Windle testified that Lindsey would attempt to engage with S.M. during their visits, but that Windle observed a lack of affection and closeness between Lindsey and her son. Windle contrasted that with her observations of how S.M.'s foster parents engage with the child, which was always in an interested and affectionate manner.

{¶64} Windle further testified that S.M. has a close bond with both of his foster parents. As to S.M.'s bond with his father, Windle testified that she does not think that the child knows who Samuel is. As to S.M.'s bond with his mother, Windle testified that S.M. is a bit more comfortable with Lindsey and would interact with her during their visits.

{¶65} Windle confirmed that S.M. was not old enough to express his own wishes as to his custodial situation. Windle testified that S.M. requires permanency for his overall well-being and that she did not think any additional time would serve to improve either Lindsey's or Samuel's chance of reunifying with S.M. Windle concluded her direct examination testimony by expressing her opinion that it would be in S.M.'s best interest

for permanent custody to be granted to the agency, particularly as he has two loving foster parents who are dedicated to his care.

{¶66} During cross examination by Lindsey's counsel, Windle testified that the agency initially had concerns about Lindsey's mental health and household management, and that those issues had therefore been included in the case plan. Windle testified that Lindsey had previously been living at a homeless shelter, which was not appropriate for S.M. Windle acknowledged that Lindsey had been attending mental health counseling, but indicated that no report had been received as to her progress. Windle acknowledged that Lindsey had completed her drug assessment and that her drug screens had been negative, except for the most recent one. Windle agreed that the case plan did not specifically mention anything about Lindsey's ability to care for S.M.'s medical needs, but explained that the case plan had been developed when S.M. was still in the hospital and those needs were unclear to the agency.

{¶67} During cross examination by Samuel's counsel, Windle testified that the goal in the case had been reunification, up until the time that the motion for permanent custody was filed. Windle also explained that Samuel's visitation was switched from in-person to virtual because he had transportation issues and also because of the problems he caused at the visitation center, such as him smoking and not wearing a mask. When shown a copy of a certificate noting Samuel's completion of parenting classes, Windle testified that she had never seen that documentation. Windle also acknowledged that Samuel's lack of a

relationship with his son was impacted by the fact that Samuel had not been able to spend much time with S.M.

{¶68} During cross examination by the guardian ad litem, Windle testified that the issues relating to visitation between Lindsey and S.M. were not improving and, in fact, appeared to be getting worse. Windle's opinion was that continuing visits between S.M. and his mother were not in the child's best interest, particularly as to his health. Windle also reviewed some specifics about Samuel's lack of engagement with S.M. during their virtual visits, including multiple occasions where Samuel sat for over five minutes at a time without saying anything to S.M. Windle testified as well to instances where Samuel became enraged and used vulgar language during the virtual visits with S.M. Windle also confirmed that Samuel had not been utilizing the full amount of visitation granted to him.

{¶69} S.M.'s foster mother, Katelyn S. ("Katelyn"), was also called as a witness by the agency at the permanent custody hearing. Katelyn and her husband had been S.M.'s foster parents for over three years, from the time he was released from the hospital following his birth. Katelyn is a pediatric nurse, who holds both a bachelor's degree and a master's degree in the field of nursing; however, she quit working just a couple of weeks after S.M. came to live with them. Katelyn's husband is also a registered nurse. Her husband switched to a work-from-home nursing-related position after S.M. came to live with them, so that they could both stay home and keep S.M. safe. Katelyn and her husband received a call from the agency shortly after S.M.'s birth, and were told that foster parents

were needed for an infant at Nationwide Children's Hospital who had unknown abnormalities. At that time, Katelyn and her husband were already licensed foster-to-adopt parents. Katelyn and her husband agreed to become foster parents to S.M., and were told that they were the agency's only placement option other than a nursing home, due to S.M.'s medical condition and special needs. Katelyn and her husband went to meet the baby, and then spent every day for two weeks with S.M. at the hospital, until the doctors there approved the couple's ability to care for S.M. and he was released. Other than two other long-term hospital admissions that were needed, S.M. has lived in Katelyn's home and been in her care for his entire life.

{¶70} Katelyn testified that S.M. is a busy, extremely motivated child, who works hard at meeting the challenges presented by his condition. Katelyn testified concerning their daily routine with S.M. in their home. S.M. receives multiple types of therapy, including speech therapy, feeding therapy, and physical therapy. Because S.M. is on supplemental oxygen and is an active toddler, he must be watched constantly in order to assess and evaluate his levels, while also planning for and implementing changes in his care as needed. Katelyn testified that S.M.'s care also requires devoting much time to case management, which includes ordering supplies, keeping appointments in line, and communicating with his various medical providers, some of whom request weekly updates. To assist in this, Katelyn and her husband have a list of weekly goals posted, which helps guide them through each week and ensures that all of S.M.'s needs are being met.

{¶71} Katelyn also testified about her attendance at, and involvement in, numerous visitations between S.M. and his mother. Katelyn explained that the agency began transporting herself and S.M. to the visitation center to meet with Lindsey after Katelyn and her husband realized that S.M. could not safely be driven there without two adults in the car, with one person driving and the other monitoring S.M. at all times. Katelyn testified that S.M. is never happy to go to the visits, and that he screams and cries and fights every morning that there is a visit scheduled. Katelyn also detailed how going anywhere with S.M. requires packing all of his equipment, including the oxygen tanks and tubes, his monitor, and extra feeding tubes, in case he pulls out a tube.

{¶72} Katelyn then testified at length about various incidents that had occurred with Lindsey at the visitations, including Lindsey's frequent tantrums that involved throwing toys, yelling, cussing, and slamming into Katelyn and staff members. Katelyn testified that Lindsey had stated that she has back problems that prevent her from lifting S.M. and from playing various games that he enjoys. Katelyn's testimony about the visitations with Lindsey corroborated the testimony given by Antigoney Lyons, with regard to Lindsey's repeated failure to plug in S.M.'s monitor as required, to pay attention to the monitor, and to take appropriate action when the monitor alarmed.

{¶73} Katelyn confirmed that Lindsey had been trained by the staff at Dr. Krivchenia's office as to S.M.'s medical equipment but that Lindsey's management of the equipment during visitations did not go well. When asked if that posed a problem for S.M.,

Katelyn testified that it absolutely did, as S.M. needs that equipment to live. Katelyn testified that, based on her observations over the past three years, Lindsey had demonstrated an inability to care for S.M.'s needs.

{¶74} Katelyn then testified specifically about the incident that occurred at a visitation with Lindsey on February 15, 2022. Upon arriving at the visitation center, Katelyn set up two oxygen tanks for Lindsey, one that S.M. was using and a full one to serve as a spare. As Katelyn watched from the office on a monitor, Lindsey turned off the oxygen tank that S.M. was using. Lindsey then seemed to get very confused and did nothing further. Katelyn ultimately ran into the room once she realized that S.M. had no oxygen, and got him switched over to a different tank. Lindsey began yelling and cussing at Katelyn, who was focused on tending to S.M. Katelyn testified that the monitor was going crazy, showing S.M.'s oxygen level to be down to 64 percent and his heart rate at only 14. Katelyn used a stethoscope she had around her neck to manually check S.M.'s heart rate and could not hear a heartbeat. Katelyn realized that S.M. needed CPR, and so she ripped the monitor cords out of the wall and ran to the door with S.M., in order to take him to a safe place to start compressions. Lindsey then blocked the door, and so Katelyn began yelling for staff to call a squad. Katelyn testified that, at that point, Lindsey left the room and Katelyn was able to get S.M.'s oxygen level stabilized and his heart rate increased. The emergency medical squad arrived, and Katelyn had the EMTs confirm with their own equipment that S.M. was once again stable. Katelyn testified that the entire

experience that day was horrible, with S.M. having been put at a very real risk of dying through Lindsey's actions.

**{¶75}** Finally, Katelyn testified on direct examination that she and her husband would not hesitate to adopt S.M., should they be given that opportunity.

**{¶76}** In cross examination by Lindsey's counsel, Katelyn testified in detail about S.M.'s oxygen requirements, how the monitor functions, and the adjustments that need to be made under various circumstances to the amount of oxygen S.M. receives. Katelyn also acknowledged that S.M. calls her "mama" and refers to her husband as "dada."

**{¶77}** During cross examination by Samuel's attorney, Katelyn testified that she had not had much contact with Samuel. When asked about S.M. referring to Katelyn and her husband as "mama" and "dada", Katelyn testified that Lindsey was the one who had suggested that early on, saying that S.M. needed to feel like he was with parents. Katelyn testified that she and her husband were initially hesitant to let S.M. refer to them in that manner, but that they learned in their Ohio Child Welfare training program that it is not unhealthy for a foster child to refer to foster parents as "mom" and "dad" because the foster parents are indeed functioning as a mother and father in the home where they live and care for the child.

**{¶78}** In cross examination by the guardian ad litem, Katelyn testified that S.M.'s visitation with his father is virtual and that Samuel has missed a number of visitations. Katelyn then testified further about S.M.'s daily routine, including the outpatient feeding

therapy that he was currently enrolled in, and the very time-consuming efforts that Katelyn and her husband were making to teach S.M. how to safely chew and swallow. Katelyn testified that while caring for S.M. kept them busy, S.M. was doing very well at meeting the goals set for him by his pediatrician's office.

{¶79} The agency also called Lindsey to the stand at the hearing, as upon cross examination. Lindsey confirmed that S.M. was medically fragile, due to a rare genetic condition inherited from his father, and that S.M.'s medical issues were apparent at birth. Lindsey testified that S.M. should eventually be coming off his oxygen support, due to his age. She asserted that the longer S.M. becomes dependent on oxygen, the longer his lungs weaken and that the best thing for S.M. would be to get him strong enough to maintain his oxygen level and heart rate like a normal child. Lindsey testified that S.M. is fragile because he has been kept in isolation, without exposure to bacteria and different environmental airflows. She added that it is not sustainable for a human body to remain on a feeding tube for life, and that S.M. needs to quit using the oxygen and feeding tube at some point, which is necessary for development. Lindsey opined that turning up S.M.'s oxygen flow rate was causing his lungs to become accustomed to the extra support and was making it harder to wean him off the oxygen.

{¶80} Lindsey further testified that, if S.M. were returned to her custody, she had a home ready for him, that she knew all his doctors, and knew where to obtain his oxygen supply. She testified that she was very knowledgeable about S.M.'s medical needs.

Lindsey criticized the medical care that S.M. had been receiving, saying he needed a second evaluation and needed to see a geneticist. She asserted that S.M. was not properly diagnosed and that he needed in-person therapy. Lindsey testified that she could care for S.M. in much the same way that she was currently caring for "E", her younger child, including taking care of diapers and letting the kids play together. Lindsey said that she had experience dealing with S.M.'s condition because his father had the same condition and she had been dealing with that for years. Lindsey testified that S.M.'s care was not being properly managed by his foster parents. She reiterated that keeping him in "isolation" was not what he needed and that, instead, he needed exposure to the environment. Lindsey asserted that S.M.'s foster mother was making it appear that the child was more ill than he actually is. At that point, Lindsey's cross examination was paused, so that the court could receive the testimony of Dr. Krivchenia, who was testifying remotely.

{¶81} Following the doctor's testimony, Lindsey resumed the stand for continued cross examination by the agency. At that point, the opinions expressed through Lindsey's testimony shifted greatly in comparison to the testimony she had given prior to Dr. Krivchenia having testified. Lindsey acknowledged that, contrary to her earlier assertion that S.M. needed to see a geneticist, he apparently already had. While Lindsey in her initial cross examination had advocated weaning S.M. from supplemental oxygen because it was weakening his lungs, she testified after the break that it was best to follow the doctor's

recommendations; however, Lindsey then added that S.M. still needed to be taken off the oxygen but slowly.

**{¶82}** Lindsey also acknowledged that she had been banned from the hospital following S.M.'s birth. Lindsey testified that she has PTSD, which is why she would not let the foster mother out of the room during the visitation when the emergency squad needed to be called. Lindsey testified that she thought the foster mother was calling the police. With regard to that same incident when S.M.'s oxygen level and heart rate plummeted, Lindsey testified that S.M. showed no signs of distress, that he did not scream or turn blue. Lindsey testified that, pursuant to an order by the trial court, she had ultimately been prohibited from handling S.M.'s medical equipment. Lindsey testified that an unknown person had turned the oxygen tank off and that she had been blamed for it.

**{¶83}** Lindsey also testified at length about Antigoney Lyons' handling of the visitation, criticizing the agency employee in various ways and further complaining about how dirty the visitation center was. With regard to the case plan that had been implemented by the agency when S.M. was two months old, Lindsey testified that she was in full compliance with that plan and had been for three years; however, she then acknowledged that she had refused to sign the case plan and had also revoked releases that she had initially signed. With regard to the drug screens required by the plan, Lindsey testified that she had given up her medical marijuana card and denied that she had tested positive for marijuana

just prior to the permanent custody hearing. She testified that she had fully completed the required medical training in order to ensure that she can care for S.M.'s medical needs.

{¶84} When asked about the foul language that she repeatedly used when at the visitation center, Lindsey testified that the use of such language was because she was from Boston, Massachusetts and everyone knows that people from Boston are "assholes". Lindsey stated that she cannot change something that has been bred into her after an entire life of living in Massachusetts. Lindsey was also asked about four children that she had given birth to while previously living in Massachusetts, and she testified that two of the children lived with their fathers and that two of the children had been taken away from her involuntarily, with permanent custody of them granted to the state of Massachusetts. Lindsey then testified that she had some type of shared custody of the two children who reside with their fathers in Massachusetts.

{¶85} Upon cross examination by the guardian ad litem, Lindsey acknowledged that the father of one of the children in Massachusetts would not permit her to have contact with his child, but Lindsey blamed that on the fact that she had been previously abused by that child's father. Upon further inquiry, Lindsey acknowledged that the father of her other child in Massachusetts would also not permit Lindsey to see that child. When asked if it was true that she also had been highly confrontational with the agency workers in Massachusetts, Lindsey said no, because there was a court order banning her from the agency's property. Lindsey was asked about employment, and she testified that she was

working at McDonald's, where she had been employed for two to three weeks. Lindsey testified that if S.M. were to be returned to her, that she would stop working to care for him. Lindsey confirmed that she lived alone with her youngest child. Lindsey testified that she had not been in regular contact with Dr. Krivchenia because she was unable to reach the doctor by phone.

{¶86} Following Lindsey's testimony, the agency called Samuel to the stand, also as upon cross examination. Samuel testified that he was currently living in Columbus, Ohio with his parents, brother, and sisters, and that he was probably not in a position to take custody of S.M. should that be ordered by the court. Samuel testified that his parents' home was filled to capacity, that he still had some "fighting" to do, in reference to a long-term fentanyl addiction, and that he also needed to work on his mental health. He testified that his addiction issue had been greatly improved over the last few months, and that his drug screenings were showing lower and lower amounts in his system. He testified that he had also recently given up smoking. Samuel testified that it was his desire that custody of S.M. be given to Lindsey, but with fifty-percent visitation rights for Samuel. Samuel testified that he had the same genetic condition as S.M., but that, in Samuel's case, his lungs improved as he got older and that he now just uses an inhaler. He testified that Lindsey was very familiar with the medical condition after helping him with it for so many years, and he has the utmost faith in her ability to potentially care for S.M.

{¶87} Upon cross examination by the guardian ad litem, Samuel testified that he had been sober for several years, but that he continues to use marijuana because it helps with his arthritis pain and his anxiety and depression. Samuel testified that he was currently employed and earning approximately $3,000.00 per month before taxes.

{¶88} After the testimony of the above witnesses, the agency moved for admission of its exhibits and rested its case.

{¶89} Lindsey then took the stand as a witness on her own behalf. Much of Lindsey's testimony on direct examination was on the same topics, and of a substantially similar substance, as that she had given during her prior cross examination.

{¶90} In addition, Lindsey testified that S.M. had interstitial lung disease, believed to be Chitayat Syndrome and "Saethre's syndrome", but she asserted that he had yet to be diagnosed. Lindsey testified that the doctors are trying to find the best treatment for S.M., and that the doctors had chosen to give him supplemental oxygen and to install a feeding tube in his belly. Lindsey testified that there is a need for the oxygen and the feeding tube, that she had previously cared for S.M., and that she was able to do so. She testified that she was willing to work with hospital staff and anyone else necessary in order to care for her son.

{¶91} Lindsey testified that, contrary to the testimony of the prior witnesses, S.M. has never reacted poorly at any of the visits with her. When asked about the visit when the emergency squad was ultimately called, Lindsey testified that she did not have a chance to

assess the monitors before Katelyn interrupted, and that the monitor had only been beeping for ten seconds. Lindsey said that she blocked the doorway because Katelyn would not explain what was wrong with S.M. While Lindsey left the visitation center at that point because she thought Katelyn was calling the police, Lindsey testified that she had checked in later with the agency caseworker. Lindsey testified that S.M. was stable when checked by the EMTs and so there was "nothing wrong."

{¶92} As to other aspects of her ability to care for S.M., Lindsey testified that her inability to lift him during visitation was due to a condition resulting from her pregnancies, that she was still under a medical restriction of not lifting over ten pounds, but that she would pick him up if necessary. Lindsey then referenced upcoming plans she had to fly to Massachusetts to visit her other children and testified, if S.M. were returned to her custody, that she would drive to Massachusetts and take S.M. with her. Lindsey testified that her home in Marion, Ohio is 1200 square feet and, while there is only one bedroom, there is a bed there for S.M., as well as a bed for herself, and also one for her younger son, "E". Lindsey testified she was familiar with the services that handle delivery of oxygen and other medical supplies for S.M. and that she was willing to make a "team effort" with the agency and the foster parents to facilitate returning S.M. to her care.

{¶93} Lindsey testified that she would love to see S.M. weaned from the oxygen but that she would comply with the advice of medical professionals in weaning him off. Lindsey then stated that she needed a second medical opinion as to the proper course of

her son's medical treatment, as the current treatment team was not working together. Lindsey acknowledged that, as testified to by prior witnesses, it has taken her 35 seconds to change oxygen tanks, but that sometimes she does it faster than that and sometimes more slowly. Lindsey testified that she had not been able to demonstrate her skills as to S.M.'s care during visitation because his foster mother would constantly intervene. Lindsey testified that she did not change diapers during her visits with S.M. because she was denied access to the diaper bag. When asked if S.M. was getting good care from his foster parents, Lindsey testified that he was getting sufficient care, but that she could provide better. Lindsey testified that she loves S.M. very much and is bonded with him, and that it is in his best interest to return home to her. She added that she wants to see S.M. live a full, productive life, unhindered by oxygen support and monitors.

{¶94} During cross examination by counsel for the agency, Lindsey's testimony primarily focused on the same issues about which she had already testified throughout the hearing. Lindsey also became extremely belligerent and argumentative while being questioned, utilized language not appropriate for the courtroom, and at great length criticized and disparaged many of the persons involved in the case, including counsel for the agency, her own attorney, the caseworker, and the foster mother.

{¶95} During cross examination by the guardian ad litem, Lindsey repeated her prior assertion that S.M. had not been diagnosed with Chitayat Syndrome, notwithstanding the fact that Dr. Krivchenia had testified to the contrary.

**{¶96}** The final witness to testify at the permanent custody hearing was Sara Babich, the guardian ad litem appointed by the trial court. Babich testified as to her education and work experience, and then detailed the investigation she had completed in the case. Babich testified that her recommendation was that the parental rights be terminated and that S.M. be placed for adoption with his foster parents. As a result of her investigation, Babich had determined that neither parent was able to adequately care for S.M, particularly in light of his health issues. Based on her interview with Lindsey and Lindsey's testimony in court, Babich concluded that Lindsey does not understand the severity of S.M.'s condition. Babich expressed concern that if S.M. were returned to Lindsey, the child would be put at risk for even more serious health complications or death. Babich testified that the agency's case plan was not drafted as well as it could have been and, while Lindsey may have completed the list of objectives set forth in the plan, it is also implied in every case plan that the parents must become able to care for the child, which had not been demonstrated here.

**{¶97}** Following this Court's independent review of the record, we find that the trial court took all relevant evidence into account and applied the appropriate statutory factors in making its "best interest of the child" determination. That decision was supported by clear and convincing evidence, as the evidence presented at the permanent custody hearing overwhelmingly established that a grant of permanent custody to the agency is in the best interest of S.M.

{¶98} In particular, we note that Samuel failed to participate fully in the visitation opportunities made available to him, and did not complete most of the case plan objectives. While Lindsey may have completed the list of objectives set forth on the face of the case plan, case plan compliance does not preclude a grant a permanent custody to a children's services agency. *See, e.g., In re Gomer,* 3d Dist. Wyandot Nos. 16–03–19, 16–03–20, and 16-03-21, 2004-Ohio-1723, ¶ 36*; In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46.

{¶99} While the record reflects that both Lindsey and Samuel expressed love or concern for S.M., and that Lindsey has established a certain bond with the child, S.M. is very well bonded with his foster parents. Further, the evidence did establish that both parents are employed, and that Lindsey had found housing and purchased clothing and toys for S.M. However, S.M.'s best interest requires more than a parent simply loving the child and providing him a place to live.

{¶100} The most important factor in this case is that, due to S.M.'s young age and his significant health issues, his well-being demands continuous monitoring and care throughout the day. As S.M. is dependent on supplemental oxygen and a feeding tube, his safety requires a custodian, or custodians, able to competently manage the medical devices and willing to do so. The evidence adduced at the permanent custody hearing indisputably established that both parents lack the ability and/or the willingness to adequately care for

S.M.'s medical needs, and therefore cannot provide him with a stable, safe, and nurturing environment. As the trial court accurately concluded, based on the evidence presented, "[c]onsistent care is vital for [S.M.]'s survival, and that care cannot be accomplished without a grant of permanent custody to MCCSB."

{¶101} For the reasons stated, and in light of all of the evidence detailed above, the trial court's decision granting permanent custody to the agency is not against the manifest weight of the evidence. The first assignments of error are overruled.

*Second Assignments of Error*

{¶102} In the second assignments of error, Lindsey and Samuel assert that the trial court failed to satisfy its obligation under App.R. 9(A)(2) to make a full record of the permanent custody hearing and thereby denied them due process. Specifically, Lindsey and Samuel argue that because the term "Inaudible" appears frequently in the transcripts of the permanent custody hearing, a thorough review of the proceedings by this Court on appeal is not possible.

App.R. 9(A)(2) provides:

The trial court shall ensure that all proceedings of record are recorded by a reliable method, which may include a stenographic/shorthand reporter, audio-recording device, and/or video-recording device. The selection of the method in each case is in the sound discretion of the trial court, except that in all capital cases the proceedings shall be recorded by a stenographic/shorthand reporter in addition to any other recording device the trial court wishes to employ.

-41-

{¶103} "An accurate transcript is the lynch pin of appellate review." *State v. Cunningham*, 4th Dist. Washington No. 91 CA 30, 1993 WL 97713, at *4 (Apr. 2. 1993). It is the trial court's responsibility to ensure that the method employed to record proceedings is adequate. *State v. Whitaker*, 3d Dist. Henry Nos. 7-91-5 to 7-91-10, 1991 WL 256517, at *1 (Nov. 27, 1991). "Nevertheless, recording equipment is not infallible and is subject to unanticipated malfunctions. For this reason, '[t]he failure of recording equipment in the trial court does not result in prejudice per se.'" *Cleveland v. McGervey*, 8th Dist. Cuyahoga No. 110770, 2022-Ohio-3911, ¶ 24, quoting *State v. Beltowski*, 11th Dist. Lake No. 2006-L-032, 2007-Ohio-3372, ¶ 30.

{¶104} In the instant case, the record reflects that the trial court digitally recorded the entirety of the permanent custody hearing, but there are a considerable number of places in the transcription of the hearing where "(Inaudible)" appears. The court reporter's note indicates that those gaps in the record are primarily due to counsel walking away from the microphone, or someone coughing in the courtroom. (Tr., 6).

{¶105} Upon the issue with the transcription being brought to the attention of the trial court after the transcript was prepared, that court and counsel utilized the procedure set forth in App.R. 9(C) to supplement the incomplete transcript, which corrected the problem to some extent.

{¶106} While the transcription of the permanent custody hearing does still contain a great number of instances where the term "(Inaudible)" appears, there is ultimately no

difficulty in fully understanding the development of the testimony at the proceeding regarding the facts at issue. That being the case, the trial court's failure to provide a complete record of the hearing does not amount to reversible error. *See In re S.L.*, 3d Dist. Union Nos. 14-15-07, 14-15-08, 2016-Ohio-5000, ¶¶ 48-52.

{¶107} We also note that Lindsey and Samuel, who were both present for the entirety of the permanent custody hearing, make no assertion on appeal as to any material testimony that they, or any other witnesses, may have given that fails to appear in the record.

{¶108} Most importantly, this Court cannot conceive of any facts that could have theoretically been testified to that would impact or change the ultimate determination that, based on overwhelming evidence in the record, neither parent is able or willing to adequately care for their medically fragile child.

{¶109} For all of those reasons, the second assignments of error are overruled.

*Conclusion*

{¶110} Having found no error in the particulars assigned and argued by either appellant in this case, the judgment of the Marion County Common Pleas Court, Family Division, is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and MILLER, J., concur.**

**/hls**